Good morning, this is Alexander Zymes for Appellant. I'd like to begin by just stating the following. This case is fundamentally, I believe, a simple one. The issue here is a follow-up. Is it permissible for officers... Closer to your speaker or whatever it is. I don't know if you're on speaker, but closer to your microphone. Can you hear me now? It's not, for me, it's not a volume issue so much as a muffled issue. Yeah, it's fuzzy. You sound fuzzy. Is it better now? No. Possibly worse. Do you have a microphone that you're talking into? Yes, I am. Let me see if it's... How is it now? You still sound quite distant. Oh, boy. Let me see. If it doesn't get better, I could possibly try using a different computer, but... Counsel, this is the operator. I would advise... I'm sorry, judges. Counsel, I would advise to connect by phone into the meeting. That's fine. Give me a second, please. Counsel, can you hear me? Yes. Yes, I can hear you. Okay, that sounds better. Okay, let me begin. Sorry about that. Good morning, Your Honors. This case before this honorable court is, in the view of appellants, a fundamentally simple one. The issue here is as follows. Is it permissible for officers of the law acting under the guise of an administrative inspection warrant to conduct a thinly disguised criminal investigation and search, thereby bypassing the constitutional requirements to establish probable cause before a search and seizure takes place? It is worth briefly quoting the Fourth Amendment in its entirety. It states as follows. The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause supported by oath and affirmation, and particularly ascribing places to be searched and the person or things to be seized. Likewise, the case at bar deals fundamentally with individuals, the appellants matter, whose privacy and security have been violated and subject to arbitrary invasion by governmental officials purporting to conduct a routine administrative search, and yet as is demonstrated by their conduct during the so-called administrative search, are acting in a manner that is designed to circumvent the strict requirements of probable cause as to suspected criminal activity. Counsel? Yes. A couple times, I think, you said this is a thinly veiled criminal investigation. I understand there were nine officers. What is your other evidence that this was actually a criminal investigation, please? Well, I would point out first of all that the fact that, I mean, the officers were there essentially to conduct, to do a peaceful assist, in other words, to do a protective sweep. That definition was given by, in the case of Marilyn B. Boyd, it was defined as a quick and limited search of premises that is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. In this case, the officers, not only were there nine officers, they were essentially, they were talking the whole time, asking questions, taking photographs, reading through binders, just asking questions all the time. I mean, the idea of a protective sweep, I mean, a brief visual, brief cursory visual inspection, this went far beyond that, as was actually obvious on the body camera. And not only that, those same two officers, Deputy Devin Hedges and Rudy Murano, who are both, by the way, narcotics officers, were also present the week before on June 7th, asking questions of the occupant, Austin Rashad, about suspected illegal activity. They were on the phone with the CEO of Icon, Thomas Lawson, asking about suspected illegal activity, asking about marijuana growth. I mean, all of that combined, I think it's very difficult to avoid just this conclusion. This was a disguised criminal investigation. I mean, the fact they were even talking at all during this entire process, I mean, why were they even talking? Why wasn't Inspector Brown inside the building doing all the talking? Why were the officers, why were the nine officers, why didn't they just briefly do like a one-minute visual inspection and leave and let Officer Brown do his investigation? So it sounds like there's an administrative warrant, and you're not challenging that, and you're not challenging, I don't think, that the building inspector was permitted to have officers come along or actually kind of go in in advance for safety reasons. But you are challenging the extent or the scope of what they did, both in terms of the length of time they took and that they were talking and they were doing more than sweeping for weapons. Is that fair? That is fair, Your Honor. And I would also say, I mean, we're not disputing that Inspector Brown had the right to have an officer present, maybe one officer, maybe two, but not eight or nine. I don't understand. What do you base it on? Do you have any evidence that you point to besides your assertion that nine for a protective sweep in this type of context was excessive? I think it's, I mean, I don't want to use the term common sense, but, I mean, I don't understand why for inspecting a warehouse, why you would need multiple officers, let alone narcotics officers, I mean, for a protective sweep. And number two, why would they even be talking? Why wouldn't they just do a visual inspection and leave, let the inspector go inside and ask his questions? It's really hard for us. With 20-20 hindsight, this is tough, right? And, of course, we take officer safety very, very seriously. It's a little hard to get a sense from what we have of the size of the building, how many, we know some walls had to be taken down eventually, so it's not just one big open warehouse area. We understand that. Some sense of it from the inside because of the body cam. But, you know, it's difficult. Now we know there wasn't a problem, but it's difficult to say that there was too many officers to go through without knowing more about, they didn't know what was in there, right, or where someone could be hiding. That's the whole nature of the exercise, right? Yes, but I would still contend that having nine officers there was excessive just for a protective sweep. I mean, as you can see in the body camera, I don't think it was a huge warehouse. It was a pretty standard size warehouse. Maybe you could argue, arguably, one, two, or three. But I think it's very difficult to justify having nine officers, not to mention narcotics officers present at the so-called protective sweep. The same issue arose in Gray, I believe. They referenced the fact there were nine officers present, and the court used that to essentially find that that was a thinly-veiled criminal investigation under the guise of an administrative inspection warrant. So I would still contend that having nine officers there present was excessive. I'm putting aside the fact that why were they even talking during this whole thing? I mean, it's supposed to be a quick visual inspection. They're not supposed to be asking questions, looking for binders, asking about marijuana growth, asking about legality in marijuana growth, questions like that. I mean, I think that clearly establishes this was a criminal investigation and was intended to find evidence of criminal activity, which they actually did not find in the end. Let's assume for the moment that there's sufficient evidence of a mixed motive. The case law seems to me to be quite clear that even a mixed motive, even a primary motive does not necessarily result in a Fourth Amendment violation unless you can show that the motive caused the search and seizure to be more intrusive than it otherwise would have been. So other than the number of officers, do you point to anything else specific that was more intrusive than it otherwise would have been? I think I would argue in honor of the fact that the officers were even talking to begin with and asking questions. Well, I've watched the video, and I think there's a lot of conversation about the fact that he had guns, that he needed to secure his dogs, and they walk through and they just ask him what different things are, and then it seems largely to be a voluntary conversation about how he's growing marijuana. Okay, but it didn't seem to me that they asked questions that were particularly intrusive. Was there any other conduct? I mean, besides talking then, I guess, was there any other conduct you can point to? I would point to one specific comment made by one of the officers, actually. It's very revealing in my opinion. Officer Iniguez, about 19 minutes into the video, he exits a building and advises the officers he has an indoor growth. Looks like it's not going to be a criminal thing, maybe a city thing. Right, which is why I think that would show the dual motive. But I'm asking for the second prong of the test, which is that there has to be some kind of effect on the level of intrusiveness of the search. So I understand that you pointed to the number of officers. I believe in your briefing you pointed to the binder, though I think there is also the video suggests the binder was voluntarily given to the officers. Is there anything else specific that you can say was more intrusive than it otherwise would have been? I would respond to that, Your Honor, by actually referencing a case that was cited in Gray. I'm asking for the facts of what happened in your case, not what happened in a different case. I would argue, Your Honor, just the fact the officers were asking, were basically, I mean, essentially the whole time, they were asking the occupant, Austin Richard, questions about the marijuana growth. The fact they were asking questions at all, that to me falls outside the boundary, falls outside the scope. Which is defined as a quick and limited search. But, Counsel, clearly that's not right. What would be wrong with an officer saying, for example, do you have weapons? I wouldn't say, Your Honor, that's inappropriate. I think that's an appropriate question to ask. But I think any question about marijuana growth, I think that exceeds the scope of a protective sweep. I mean, any question beyond weapons, any question beyond any other occupants in the building, any dogs, for example, I think anything beyond that would exceed the scope of a protective sweep. Okay. Thank you. Are you challenging the court's qualified immunity aspect of its decision? Yes, Your Honor. Do you have an argument on that before your time runs out? Yeah, I would say, I mean, first of all, just to briefly say, essentially there's a two-step analysis here. First of all, we have to show that a constitutional right has been violated. I would argue that we've actually shown that. Number two is we have to show that a clearly established right was violated. I think the case of Gray makes it clear. I mean, they define a protective sweep as a quick and limited search of the premises. And it also cites here in Gray another case, Cuevas v. DeRocco, where the court accepted evidence that deputies may have opened desk drawers and touched and moved items. In that case of Cuevas, it says by opening at least one drawer, an officer exceeded the limits of a lawful protective sweep. In this case, I believe that case law establishes that officers doing more than that cursory visual inspection could be found to have exceeded the scope of an administrative inspection warrant and to have exceeded their role to basically just do a peaceable assist that was minimally intrusive. So I would argue that we satisfy that second point, Your Honor. Sorry, do you want to just follow up? On the issue of our court has seemingly articulated two different tests for a Fourth Amendment violation in Gray v. DeRocco, do you have any argument as to why Gray should apply in this case? Your Honor, I think the facts of Gray were somewhat similar. I mean, I would just point to the fact that in Gray they specifically referenced the presence of nine officers, which is very similar to what happened here. I mean, that to me alone, even put inside everything else, the fact that they brought nine officers. And in this case, apart from, I mean... But, Counsel, Counsel, Judge Sung's asking a different question. She's asking why should Gray be the test. I believe Gray is the controlling lawyer, Your Honor. That's my understanding. I mean, it's fairly a recent law. And I think the facts of Gray are similar to this case. And that's why I would argue that the Gray test, the standard set for Gray should apply here. Okay. All right. Counsel, do you want to reserve a minute? Yes, Your Honor. Okay, thank you. Mr. Christensen? Good morning, Your Honors. Alan Christensen for defendants and appellees. Sorry, Marina and Hedge. Can the court hear me okay? Yes, we can. Thank you. So I just want to point out a couple of things briefly, and I'd be happy to answer questions. But the appellees, we did point out in our brief that the appellants didn't raise their state law trespass claim in their opening brief. So we did argue that that would constitute a waiver. I'd also point out that appellees, what looks like an express waiver on page five where the appellants pray that the Ninth Circuit Court of Appeals issue an order reversing the order and judgment of the United States District Court as to the cause of action for unreasonable search and seizure pursuant to 42 USC 1983. So I think appellants have waived any trespass, the state law trespass claim. Regarding the Fourth Amendment claim, I think the court is, Your Honors are right on. There was an undisputed facially valid inspection warrant, an administrative inspection warrant. The lower court found that there was sufficient probable cause to support the warrant. And here, the defendant appellees, these two defendant appellees, Marino and Hedge, they didn't do anything. Counsel is arguing about opening drawers or anything like that. That didn't happen here. And as the court probably saw by the body cam video, Mr. Austin Reshock, who was present at the time, was pretty talkative. He seemed almost to be bragging about his marijuana setup, which we point out in our brief, that's a zoning and a code enforcement issue. That's not a criminal issue. But he was the one doing most of the talking. He handed the folder that's in question to the officers and said, hey, look at that, that's for you guys. So I don't think that there's anything that went above and beyond the administrative inspection warrant. I think the lower court found that as well. Well, the lower court found that it was hard to decide. So if you assume there's a mixed motive because there were nine officers and the scope of the search, at least the duration of it, seemed to be longer than usual, then you get to qualified immunity, I think. This is a unique posture because the circumstances here, we spend a lot of time reminding ourselves that we look at most searches from the objective of an objective third-party officer, not the subjective intent of the officers involved. But that's not the case here, is it? I'm not sure what you're asking. I think that we still – I mean, I think you're right. They do kind of look at the subjective intent. Was the intent based on a criminal investigation? But there is no evidence of that. There were no criminal charges. There were no arrests. There were no detentions. Like the other cases that are being relied on, there were arrests. There were detentions. There were criminal charges brought. That never happened. You are deviating from the decision tree of the district court. And we look at the subjective intent of the officers. I'm a little concerned about the interplay between taking all the disputed facts in the light most favorable to the opposing party and then relying on qualified immunity. Because I don't think you're – you might be biting off more than you need to, is what I'm trying to suggest. I don't think you really are taking the position that if officers subjectively intended to be conducting a criminal investigation here that they would be entitled to qualified immunity. Are you? No. Okay. No. But as far as qualified immunity is concerned, I would like to point out that the United States v. Gray case, that plaintiff has been relying on and that the court raised some questions about, that case was decided after the inspection here. The inspection here took place in 2018, June 14, 2018. The United States v. Gray wasn't decided until 2020. And even the underlying lower matter in Gray wasn't decided until September of 2018. So the case – that wasn't precedent at the time. So I don't think you can – plaintiffs can rely on that to – So what do you think is the appropriate standard, sir? Let me ask you this. Do you think we should view this as a dwelling, a search of a dwelling, administrative search of a dwelling because it was – because somebody was living there, at least staying there sometimes? Or should we consider this to be the search of a commercial space? Well, it was a commercial space which didn't allow a dwelling, which was part of the problem. So the administrative inspection was specifically for – which had to deal with people living there, which they weren't supposed to, as well as any building or construction without permits. So is it your position that a Roscoe is the appropriate standard? I'm sorry, Your Honor, I didn't hear you. I'm sorry. My question is, is it your position that a Roscoe is the appropriate standard? You clearly articulated you think Gray is not the appropriate standard, right? Well, I think Gray is probably a reasonable standard, but I just think as far as defeating qualified immunity, that wasn't in place at the time. Right. So we couldn't say that – we couldn't charge officers with knowledge of the Gray standards, what you're saying, right? Right. Thank you. Do you have any other questions, or should I continue? Does anyone have any other questions? No. I do. The search happened in June 2018, correct? That's correct. And it seems to me that even before Gray, though, there is plenty of case law talking about how officers can't use administrative search as pretext to conduct a criminal investigation. That unconstitutionally lowers the standard, probable cause standard for a search. And you even have a Roscoe, which predated the search in this case, which still says, you know, if there's a primary motive to conduct a search, conduct a criminal investigation, plus you can show that the motive caused the search to be more intrusive, that would be a Fourth Amendment violation. Seems to me that would have been clearly established law by the time this search was taking place. Do you dispute that? No, I don't. Okay. It also seems to me that the district court found that there was at least a material dispute of fact or based on the allegations, enough to show a mixed motive. There's the body cam footage where an officer talks about, it looks like this is not going to be a criminal matter. Assume for the moment there's at least enough here to show mixed motive. What is your argument that there is no Fourth Amendment violation still? Or do you concede that there would be one? Well, I mean, I disagree with the premise that there was anything done by these officers that constituted a Fourth Amendment violation. The plaintiff is referring to a body cam footage by a statement of Officer Iniguez, who is not a defendant here, who said, I don't think there's a criminal issue. And I don't know what he was referring to. There's no evidence of that. He could have been referring to the firearm or something else, that there was no other issues relating to criminal matters. I just don't know. And I think the lower court's opinion was, just looking at the number of officers present, that might be an issue. The court couldn't tell. That might be an issue. But as far as these two deputies are concerned, they're not supervisors. They didn't have any control of anybody else being there. And I don't know what the purpose was other than to just observe. I don't know that it – I mean, I think the lower court found it didn't increase the effect of the administrative warrant. And I think what we argued in our opening brief was if anything, we decreased the length of time. And, in fact, we didn't really do anything other than when there was a safety sweep, the inspector entered. When the inspector left, the officers left. I mean, other than to give back, assumably, his firearm and, you know, just go drive away. So I don't think that there was anything. I think the lower court made the assumption that there was a violation. I don't particularly agree with that, but that's what we're left with. And I think as far as qualified immunity is concerned, there just was no case law to say that what these two deputies did, which was nothing. I think it's undisputed they didn't give any orders, detain anybody, arrest anybody, search anything. Whatever it was they did was not unconstitutional. At least it wasn't clearly established at the time. I don't know if that answers your question. More or less. I don't think there are any further questions. So thank you, Mr. Christensen. Mr. Zamey, you have a minute. Thank you. I will just respond to one thing the opposing counsel said regarding the no case law. There were two other cases that were actually referenced in gray. One is Maryland v. Boyd, which defined a protective sweep, as I think I mentioned before, as a quick and limited search of premises that is narrowly confined to a cursory visual inspection. And then the other case of Cuevas v. DeRocco, finding that an officer who opened even one drawer exceeded the limits of a lawful protective sweep. So the officer should have been in notice. What constitutes exceeding the boundaries of a protective sweep? In this case, I think it went even beyond that. As I've said before, they were asking multiple questions, reading through the binder, reading through the daily log of Mr. Rashak. So very clearly there was case law on point here, and I think it is very clear there was a Fourth Amendment violation, and I think that's indisputable. That's all. Thank you, counsel. Icon Desert Logistics v. the City of Blythe will be submitted, and this session of the court is adjourned for today. All rise. This court for this session stands adjourned.
judges: WARDLAW, CHRISTEN, SUNG